IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

MICHAEL LEE GARRISON                                                    PLAINTIFF
ADC #103455

V.                                      NO. 5:02CV00005 JWC

JAMES T. BANKS, et al                                                  DEFENDANTS

MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

Plaintiff is an inmate who was housed at the Varner Super Max Unit (VSM) of the

Arkansas Department of Correction (ADC) at the time of the events on which he bases his

complaint.  He is now housed at the East Arkansas Regional Unit, where he continues to

serve his life sentence.  He brings this 42 U.S.C. § 1983 action alleging that he was denied

religious and other publications in violation of the First and Fourteenth Amendments of the

United States Constitution while at the VSM.  Plaintiff invokes the First Amendment rights

of religion and speech, and his guarantee of equal protection under the law.  He also avers

that Defendants retaliated against him for filing this action.

Defendants and their positions during the relevant time period are:  James T. Banks,

Assistant Warden, VSM; Randall E. Manus, Assistant Warden, VSM; Rick Toney, Warden,

VSM; Ray Hobbs, Deputy Director, ADC; Ronald Dobbs, Deputy Director, ADC; Larry May,

Assistant Deputy Director, ADC.  Each Defendant was somehow personally involved in the

events giving rise to this action; either through involvement in creating VSM policies, direct

actions taken affecting Plaintiff or review of such policies and actions.

Following a bench trial,[1] the Court makes the following findings of fact and conclusions of law:

## II.  FACTUAL BACKGROUND

The VSM is the highest security unit in the ADC.  It was opened in the fall of 2000, to deal with dangerous and aggressive inmates and those who repeatedly do not conform to prison rules.  Plaintiff was transferred there shortly after it opened.  Inmates are assigned there based on their behavior while in prison, rather than on the nature of their conviction.  That is, those who have demonstrated they can not or will not adhere to prison rules and function in the general population are assigned to the VSM.  The purposes of the unit are to safely and securely house those inmates and to help them improve their behavior so they can function successfully in the general population.  Thus, the unit is intended to offer more than mere administrative segregation.  To further the second goal, officials adopted an incentive level program as a behavior modification device.  Under this program, inmates may progress through five levels.  The inmate must spend a certain amount of time at each level and maintain good behavior to be promoted to the next.  At level one, all privileges are greatly restricted and the inmate is kept in his single-man cell twenty-three hours each day.  As the inmate progresses through the various levels, privileges such as visitation, phone calls, television, receipt of authorized reading materials, spending money, commissary privileges and library privileges are increased.  While the inmate is in the incentive level program, any major disciplinary infraction results in the inmate's being reduced to level one, to start the process anew.  At the successful

---

[1] The parties have consented to the jurisdiction of the Magistrate Judge.

completion of the five levels, the inmate is eligible for transfer to other units, which offer much less restrictive environments. This program was based on similar programs adopted in other parts of the country and its underlying theory is that by offering intractable prisoners the incentives of more privileges and a less restrictive environment, they will be motivated to learn to control their behavior. Defendants have done no empirical studies to determine the success of the program. However, they all testified they think it is effective and that it has helped a good number of inmates improve their behavior substantially and attain a degree of rehabilitation. The testimony as to the percentage of inmates who successfully complete the program and leave the unit was unclear. Defendant Toney, a former warden of the VSM, testified that seventy-five to eighty percent of the assigned inmates successfully completed the program, but had apparently testified in deposition to a fifty percent completion rate. He attributed part of the discrepancy in his testimony to the fact that more inmates had gone through the program by the time of trial. In any event, the evidence shows that a significant number of inmates successfully complete the program. As an example, Defendants point to Plaintiff. Despite one setback,[2] he has completed the program and been transferred to the East Arkansas Regional Unit. His disciplinary record was poor before his time at the VSM. However, he has been charged only one time with a major disciplinary since his completion of the program and that charge was dismissed. Plaintiff attributes this to maturity gained with age[3] and experience and says the VSM program was a hindrance rather than a help.

---

[2] This was the major disciplinary he received while in the program which he says was retaliatory.

[3] He was age 29 at the time of the hearing.

However, the fact remains that his behavior has improved to the point that he has been successful in less restrictive conditions.

The aspect of the incentive level program that has caused the basic problem in this case is the policy that inmates may keep no more than two personal books in their possession in their cell at any given time.  This limit remains at two through all steps.  That is, it is not relaxed as the inmate progresses through the five levels.  In addition to the personal books, inmates are allowed to check out a limited number of books from the library and keep them in their cell.  Library privileges and access to other reading materials are expanded as the inmate achieves higher levels in the program.  At the inception of the incentive program in 2000, the two books had to be primary religious texts.  Other materials that might be considered books were allowed in addition to the two texts if they were part of a course of study, which had to include a testing system and to provide a means of certifying completion.  Plaintiff was disallowed materials which did not meet these criteria while this version of the rule was in place.  Effective September 17, 2001, the policy was changed to allow the two books to be either religious or secular.  No other books are allowed, even if considered a course of study or study materials.  According to Defendant Banks, the policy was changed partly because it had become very difficult  to process the large volume of self-help materials ordered by the prisoners.  Additionally, the officials decided it would be better if the materials were not restricted in content, so long as generally acceptable under the rules.[4]  If an inmate possesses two books and receives one or two additional books in a shipment, he is given the choice of which two to keep.  The

---

[4] Of course, any materials must meet general requirements.  For example, pornography, materials advocating racial or other violence, etc., are prohibited.

others must be donated, destroyed or sent to a third party at the inmate's expense.  The

inmates were notified of this change.[5]  If a shipment is received containing more than two

books, it is merely refused and returned, and the inmate is sent a notice of refusal.  No

attempt is made to allow the inmate to select up to two items of the shipment or to merely

accept two and refuse the rest.  Inmates are told they should inform the senders not to ship

more than two books at a time.  The volume of materials ordered by and sent to inmates

at the unit is large and difficult to manage.  It is burdensome to process the materials and

to determine what is allowable.

Neither the original nor the revised written policies [6] and procedures define what is

meant by the term "book."  The question arose whether a pamphlet should be considered

a book.  Before the revision, a pamphlet was not classified as a book if it included the

requirements to be a course of study, i.e., testing and certification of completion.  At some

time close to the time of the revision, Defendant Banks consulted the Merriam-Webster

dictionary and found that a pamphlet was defined as an "unbound book."  He adopted this

definition for application of the policy.  While he did not consult with officials higher in the

chain of command, he had authority to make this decision.  All pamphlets were, and are,

treated as books if they have two or more pages, regardless of length or bulk and

regardless of whether they constituted a course of study.  Defendant Manus testified that

he had never seen a pamphlet with less than about ten to fifteen pages.  A single sheet

folded is considered a brochure and not subject to the two book rule.  Plaintiff was notified,

---

[5] Pl.'s ex.17.

[6] See Pl.'s ex. 63 and Defs.' ex. 1.

in response to his early complaints, that pamphlets were considered to be books and subject to the rule.  He was also encouraged to let his senders know there was a two book limit.[7]  Some pamphlet materials have been denied Plaintiff under this interpretation because they were considered books and the shipment exceeded the two book limit.  Defendant Manus candidly testified that in the early days after his being given responsibility for mail decisions [8] he may have been somewhat inconsistent and may have made errors in deciding what should and should not be allowed.

Defendants say the two book limit is justified because restricting the number of personal books remains an incentive to continue good behavior in that the inmate is motivated to complete the entire program to have this limitation eliminated.  They also argue that the amount of material in a cell at any one time must be limited.  As the inmates progress through the incentive levels, they are allowed to receive other written materials such as newspapers and magazines, but are also required to cycle those to limit the amount of material in the cell at any given time.  Their library privileges increase and they are allowed to have more library books in their cells at one time.  Defendants say an excessive amount of printed materials in a small cell can create a vermin problem and a danger of fire.  They can also create a security problem because they provide additional hiding places for contraband or weapons.  This is of greater concern at the VSM than at other units because the most incorrigible and dangerous inmates are housed at the VSM.

---

[7]  See Defs.' ex. 19 & 20.

[8]  Defendant Manus assumed the mail screening responsibilities from Defendant Banks.

Plaintiff was sent to the VSM on November 1, 2000.  He progressed through the five incentive levels and was transferred from VSM to the East Arkansas Regional Unit on September 18, 2003, where he remains.  He is a professed Christian and Defendants do not challenge his assertion of a sincerely held religious belief.  He testified that he is serving a life sentence and does not expect to be released, so the ADC is his "home."  He has a great interest in studying the Bible and feels that various study programs, religious pamphlets and other materials materially aid him in his quest to understand and live by his religion, and thereby obtain the grace of God.  He testified that inmates had resource lists from which he could send off for study materials and courses from various organizations.  He felt that a variety of sources was essential to a more complete understanding.  Some met the criteria for study courses, but some did not because of lack of funds.  He said that the denial of religious materials while at the VSM arbitrarily interfered with his study of the Bible, causing him great mental anguish.

The fact that materials were denied to Plaintiff is not in controversy.  Plaintiff introduced a number of grievances indicating that on at least ten occasions he was denied written materials, both religious and secular.  Most of the denials complained of were prior to the policy change which occurred September 17, 2001.  The proof shows that he did receive religious study materials during that period, in addition to the two book limit.  There is no question, however, that on several occasions, officials rejected materials he had ordered on the basis that they were excess pamphlets, books, etc.

He challenges the incentive level's restrictions, especially the two book limit with its definition of "book" as including pamphlets, as being facially invalid and invalid as applied to him.

7

### III.  POTENTIAL REMEDIES

Plaintiff's primary demand for relief is that the ADC be required to abolish the "Behavior Modification Program" that restricts inmates' receipt and retention of religious materials.  This is tantamount to asking for injunctive relief.  However, Plaintiff is no longer subject to the challenged restriction or incarcerated at the VSM, making injunctive relief inappropriate.  An issue becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  Murphy v. Hunt, 455 U.S. 478, 481 (1982) (citing United States Parole Comm'n v. Geraghty, 445 U.S. 388, 396 (1980) (quoting Powell v. McCormack, 395 U.S. 486, 496 (1969)).  The general rule is that an inmate cannot obtain injunctive relief pursuant to § 1983 when he is no longer subject to the prison conditions of which he complains.  Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir. 1985) (transfer); Hickman v. Missouri, 144 F.3d 1141, 1142 (8th Cir.1998) (released on parole); see also Smith v. Hundley, 190 F.3d 852, 855 (8th Cir. 1999) (transfer).

Plaintiff also makes demand for the value of the radio that was confiscated.  As will be discussed below, the Court finds that the major disciplinary imposed on Plaintiff and confiscation of the radio were not retaliatory and not violative of the Constitution.

Plaintiff demands punitive damages.  Under liberal rules of pleading, the Court will assume that he has made a demand for compensatory damages arising out of the First Amendment, Equal Protection and retaliation claims as well.  However, Plaintiff, who does not allege physical injury, would be entitled to no more than nominal compensatory damages of one dollar.  The Eighth Circuit has now joined the majority of courts that hold 42 U.S.C. § 1997e(e)'s limitations on damages for mental or emotional injury apply to all

federal prisoner lawsuits alleging First Amendment violations.  See Royal v. Kautzky, 375 F.3d 720, 723 (8th Cir. 2004) (concluding that § 1997e(e) limits plaintiff's recovery for mental or emotional injury to nominal and punitive damages and injunctive and declaratory relief; First Amendment context) (citing Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 308 (1986); Smith v. Wade, 461 U.S. 30, 56 (1983); Hughes v. Lott, 350 F.3d 1157, 1162 (11th Cir. 2003); Thompson v. Carter, 284 F.3d 411, 418 (2d Cir. 2002); Searles v. Van Bebber, 251 F.3d 869, 878-79 (10th Cir. 2001); Davis v. Dist. of Columbia, 158 F.3d 1342, 1346 (D.C. Cir. 1998); Zehner v. Trigg, 133 F.3d 459, 462 (7th Cir. 1997)).

Punitive damages may be awarded in a § 1983 action when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  Duncan v. Wells, 23 F.3d 1322, 1324 (8th Cir. 1994); Walters v. Grossheim, 990 F.2d 381, 385 (8th Cir. 1993). Because the Court finds no constitutional violation has occurred, Plaintiff is not entitled to compensatory damages, which must be found before punitive damages can be considered.  Even if the Court were to find that Plaintiff had established a basis for compensatory damages, none of Defendants' actions meet the standard for imposition of punitive damages.

## IV.  FIRST AMENDMENT CLAIMS

"Convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison."  Bell v. Wolfish, 441 U.S. 520, 545 (1979) (internal citations omitted); see also Turner v. Safley, 482 U.S. 78, 84 (1987).  It is well established that prisoners do retain First Amendment protection.  Pell v. Procunier, 417 U.S. 817, 822 (1974).  Nevertheless, "incarceration brings about the necessary withdrawal or limitation

of many privileges and rights, a retraction justified by the considerations underlying our penal system." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (quoting Price v. Johnston, 334 U.S. 266, 285 (1948)).  The United States Supreme Court has determined that restrictions on a prisoner's constitutional rights will be judged under a "reasonableness" standard.  Accordingly, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner, 482 U.S. at 89; Pell, 417 U.S. at 822 (in the First Amendment context, "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system").

### Freedom of Religion

Since 1972, the law has been clearly established that prison officials must afford inmates a reasonable opportunity to practice their religion. Thomas v. Gunter, 103 F.3d 700, 703 (8th Cir. 1997) (citing Cruz v. Beto, 405 U.S. 319, 322 (1972)).  The First Amendment has two clauses dealing with religion.  The Free Exercise Clause "protects the right of citizens to exercise religious beliefs free of any governmental interference or restraint." Tarsney v. O'Keefe, 225 F.3d 929, 935 (8th Cir. 2000).  In contrast, the Establishment Clause prevents the government from establishing an official religion or coercing the practice of religion. Id.  Plaintiff's challenge in this case is based on the Free Exercise Clause.[9]

---

[9] The only time the Establishment Clause could have come into question is the period before September 17, 2001, when VSM inmates were limited to two religious texts.  It would be inconsistent for Plaintiff to assert an establishment violation when the thrust of his complaint is that he, as a Christian, was being denied additional religious reading material.

A prison policy violates the Free Exercise Clause only if it "substantially burdens" an inmate's sincerely held religious beliefs. <u>Weir v. Nix</u>, 114 F.3d 817, 820 (8th Cir. 1997). In <u>Weir</u>, the Court explained that in order to be a "substantial burden" on an inmate's free exercise rights, the prison policy "must significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual [religious] beliefs; must meaningfully curtail a [person's] ability to express adherence to his or her faith; or must deny a [person] reasonable opportunities to engage in those activities that are fundamental to a [person's] religion." <u>Id</u>. (quoting <u>Werner v. McCotter</u>, 49 F.3d 1476, 1480 (10th Cir.), <u>cert</u>. <u>denied</u>, <u>Thomas v. McCotter</u>, 515 U.S. 1166 (1995)).

The third factor mentioned in the above cases seems to be the most applicable to the case at hand.  It is difficult to see how the VSM policy significantly constrained conduct manifesting a central tenant of Plaintiff's faith or how it would meaningfully curtail his ability to express adherence to his faith.  He was allowed to keep two religious texts, one of which was the Christian Bible, the core of all teachings of the faith.

On the other hand, it can be argued that educating one's self through a variety of sources would lead to a deeper understanding which, in turn, would lead to true adherence to the tenants of the faith, and that such study and education is fundamental to one's faith. The question then becomes whether the policy in fact denied Plaintiff the "reasonable opportunity" to engage in self education activity.  To answer this question, it is necessary to examine what the policy did and did not restrict.  The policy did not dictate the types of books that Plaintiff could retain in his cell.  Both could be religious material.  Nor did the policy directly restrict access to religious materials.  Its only restriction was on the number of texts the prisoner could <u>keep</u> in his cell.  Assuming that Plaintiff would want to keep the

11

Bible, he was free to study the other text and then exchange it for new material.  He argued that he did not have the means to send material home.  He could have donated it to the prison library, where it would be available to other inmates and remain available to him. Plaintiff says it was financially impossible to obtain new material if he had to surrender the old.  However, the expense would have remained the same whether he donated old material or kept it when he ordered new material.  Further, Plaintiff had library privileges and the right to keep a number of library materials in his cell.  These privileges increased as he progressed through the incentive levels.  While he may have considered the library inadequate, that was a source of study materials.  Also, as he progressed through the incentive levels, his privileges to obtain periodicals and magazines increased.  He was free to order or subscribe to religious study materials.  While Plaintiff may not have received all the religious study materials he desired, he has not carried the burden of showing the policy prevented a reasonable opportunity to increase his knowledge of the Christian faith.

## Freedom of Speech

It is well settled that an inmate's First Amendment right to freedom of speech may be limited by prison regulations that are reasonably related to legitimate penological interests.  Turner v. Safely, 482 U.S. 78, 92 (1987).  In Cooper v. Schriro, 189 F.3d 781, 784 (8th Cir. 1999), the Eighth Circuit held that "[p]rison regulations which restrict an inmate's access to publications are valid under the Constitution if 'reasonably related to legitimate penological interests.'"  When making this determination, a court must consider: (1) whether a valid, rational connection exists between the regulation and a neutral, legitimate government interest; (2) whether alternative means exist for inmates to exercise the constitutional right at issue; (3) what impact the accommodation of the right will have

12

on inmates, prison personnel, and allocation of prison resources; and (4) whether obvious, easy alternatives exist. Turner, 482 U.S. at 89; Dawson v. Scurr, 986 F.2d 257, 260 (8th Cir. 1993).

Plaintiff's basic position is that the incentive program has no rational basis because he feels it is not effective in changing inmates' behavior. He said he thinks the program does more harm than good because limiting reading materials, especially religious materials, causes resentment and impedes an inmate's spiritual growth. Additionally, he argues that the two book limit is an arbitrary limit, made more irrational by Defendant Banks' interpreting the term "book" as including any pamphlet, no matter how short it may be. He says this limit impeded his ability to see a variety of materials, in order to better understand his religion and its requirements and has no valid penological basis.

The VSM incentive program, when examined in previous cases, has been found not violative of the freedoms of religion and speech. Proctor v. Toney, No. 5:01CV00195 (E.D. Ark. July 8, 2003) (adopting Magistrate Judge's recommendation dated May 2, 2003); Jones v. Banks, No. 5:01CV00216 (E.D. Ark. Apr. 3, 2002) aff'd, 51 F. App'x 608 (8th Cir. 2002). This Court agrees.

Does a valid, rational connection exist between the VSM incentive program and a neutral, legitimate government interest? There is certainly a neutral, legitimate government interest in teaching inmates to stop aggressive and violent behavior, to give them a chance to learn self restraint and to give them an incentive to conform to prison rules and regulations so they can function in the general prison population. The obvious beneficial results are greater safety within the prison system for both prisoners and officials, less disruption in prison operations, less stress on officials and prisoners and a reduction in the

overall expense of operating the system.  Also, gaining control over one's behavior is a good first step in overall rehabilitation, which well help inmates function when released. Does the incentive program promote these goals; i.e. is there a rational connection between the policy and the legitimate interest?  The Court finds there is.  The program does more than merely segregate incorrigible and violent prisoners; it provides a strong incentive to prisoners to modify their behavior.  The principle of reward is a long accepted means of improving behavior.  As one of the Defendants testified, by greatly restricting privileges, then gradually adding them as the inmate progresses, the program gives inmates  time to think about their situation and to realize that they will be better off to learn self control.  With each level comes added success and the hope of even greater rewards. It seems logical that the ability to control one's behavior improves with practice.  There is testimony in the record, which the Court finds credible, that the program has proved successful for a significant number of inmates.  That testimony remains unrebutted by hard evidence.  Plaintiff's proof consists of his statement of opinion.  Plaintiff himself is an example of the validity of the program.

The more specific question presented by this case is whether the two book limit, with the definition of "book" taken to include pamphlets, is rationally connected to the government interest.  This limitation is one of the restrictions intended to give inmates an incentive to complete the program.  In the prison setting, especially where the inmate is restricted to his cell twenty-three hours every day, there would be little to do to pass the time.  Thus, access to reading material is obviously important to inmates and would provide a powerful incentive to behave in a manner calculated to regain greater reading privileges. To allow inmates the privilege of keeping an unrestricted amount of reading material in

their cells would adversely impact the stated purpose of the incentive program.   While one might quibble over how much restriction is enough, a rational relationship certainly exists. Including pamphlets in the definition of "book" does not change the answer to this issue. When the question arose, Defendant Manus consulted the dictionary, which defined "pamphlet" as an unbound book.   Adopting the established definition is not irrational. Defendants preferred a simple, "bright line" definition, rather than trying to limit page numbers or adopt other difficult-to-apply criteria which could lead to irrational and inconsistent censorship.   This too is not irrational.   Plaintiff has failed to demonstrate that the regulation, as applied, has no rational connection to the legitimate penological aim.

The next question to be answered in conducting the free speech analysis is whether a reasonable alternative exists for the inmates to exercise their right of access to secular materials.   It does.   Again, the restriction in question goes only to the amount of material each inmate can keep in his cell, not a general restriction on access to books.   As previously discussed, they are free to exchange materials.   There is access to the prison library.   The inmates may subscribe to at least one newspaper at all levels.   As they progress through the various levels, their right of access to other materials such as magazines and study courses increases.

The next step of the analysis is to determine the impact that more full accommodation of the right to receive materials would have.   Defendants testified that the volume of incoming materials is very heavy.   A less certain standard in determining what materials would be allowed to be kept would greatly increase the burden on the prison staff in reviewing such materials as they arrived at the unit.   Further, allowing a greater amount of material to be kept in each inmate's cell raises problems of sanitation, safety and

security.  Obviously, it would be more difficult to keep the cell clean.  Voluminous material would provide more opportunity for hiding contraband and would make periodic sweeps (shakedowns) for contraband more difficult and time consuming.  The risk of fire in the cell would be greater.  Plaintiff argues that volume is not considered a problem in other units.  This argument overlooks the fact that the situation is different.  Inmates in other units are allowed more unrestricted materials, but they must fit in the inmate's personal locker.  Further, other units house less dangerous inmates and the need for security and protection against contraband is greater at the VSM.  Doing away with the restrictions altogether would adversely impact the effectiveness of the program and easing the restrictions on possession would have an adverse effect on prison operations, sanitation and safety.

The final question is whether there is an obvious, easy alternative to the program.  There is not.  Dealing with intractable inmates is a difficult proposition, and neither Plaintiff nor the Court can suggest an alternative to the program in place for dealing with this problem.

Considering all factors, the Court finds that the VSM incentive level program, with its specific limitations does not violate Plaintiff's right to receive written materials, either facially or as applied to him.

## V.  EQUAL PROTECTION CLAIM

The Equal Protection Clause generally requires the government to treat similarly situated people alike.  <u>City of Cleburne v. Cleburne Living Ctr., Inc.</u>, 473 U.S. 432, 439 (1985).  "Dissimilar treatment of dissimilarly situated persons" does not violate the Equal Protection Clause.  <u>Klinger v. Dep't of Corr.</u>, 31 F.3d 727, 731 (8th Cir. 1994).  The first step in evaluating an equal protection claim, therefore, is determining whether Plaintiff has

demonstrated that he was treated differently than others who were similarly situated to him. Keevan v. Smith, 100 F.3d 644, 648 (8th Cir. 1996); Hosna v. Groose, 80 F.3d 298, 304 & n.8 (8th Cir. 1996); Klinger, 31 F.3d at 731.  This is a threshold question.  As was observed in Klinger, "Absent a threshold showing that [plaintiff] is similarly situated to those who allegedly receive favorable treatment, the plaintiff does not have a viable equal protection claim."  Klinger, 31 F.3d at 731.

Plaintiff's proof on this issue consisted solely of his conclusory testimony that, during the period before September 17, 2001, when inmates could keep only two primary religious texts in their cells, Mormons got to keep the Book of Mormon as a primary text and Muslim inmates got to keep materials that should not have been considered primary religious texts. Plaintiff also said that inmate Jones got to keep newsletters, whereas Plaintiff did not.  At another point in his testimony, Plaintiff stated that he did not feel he was singled out for treatment different from that of the other inmates.  Plaintiff has made no substantial showing that others similarly situated received more favorable treatment, and has failed to carry his burden of demonstrating a violation of the Equal Protection Clause.

## VI.  RETALIATION CLAIMS

Otherwise proper acts by prison officials may be actionable under § 1983 if done in retaliation for the exercise of a constitutionally protected right.  Cody v. Weber, 256 F.3d 764, 771 (8th Cir. 2001); Madewell v. Roberts, 909 F.2d 1203, 1206 (8th Cir. 1990); Sprouse v. Babcock, 870 F.2d 450, 452 (8th Cir. 1989).  The retaliatory conduct does not itself need to be a constitutional violation in order to be actionable, because "the violation lies in the *intent* to impede access to the courts."  Cody, 256 F.3d at 771.  Protected conduct includes the filing of grievances pursuant to an established prison procedure,

Cooper v. Schriro, 189 F.3d 781, 784 (8th Cir. 1999), or the filing of legal actions, Goff v. Burton, 91 F.3d 1188, 1191 (8th Cir. 1996).

Plaintiff claims that Defendants retaliated against him for filing this action by denying him a family visit and falsely charging him with a major disciplinary, which resulted in his being reduced from level four to level one in the incentive program.

Plaintiff filed this action on January 7, 2002.  According to the official Court file, service was directed by order entered January 22, 2002.[10]  The Marshal's returns show that service was not effected until January 31, 2002, when the certified mail sent to Defendants was receipted for by the VSM.[11]  There is no proof in the record that any Defendant had prior notice that the suit had been filed.  In fact, Defendant Banks testified that his suit papers were stamped received by his office on February 8, 2002, and that he was not aware of the suit until February 9, 2002, when he completed a litigation form.

On or before January 24, 2002, officers confiscated two radios from inmates who should not have possessed them because they had not achieved incentive level three, which was the level required for possession of radios.  On that date, Defendant Banks advised Officer Jimmy Wayne Via to investigate.  On January 31, 2002, Via learned that one of the radios had Plaintiff's ADC number engraved on it.  Via questioned Plaintiff, who stated that he had passed his radio over to another cell block for another inmate to listen to and had gotten a different radio back.  On that same day, Via filed a major disciplinary charge against Plaintiff, alleging, among other things, that Plaintiff was guilty of the

---

[10] Docket entry #3.

[11] Docket entries 4 through 8.

18

exchange of unauthorized articles.[12]   Plaintiff was found guilty of the unauthorized exchange charge on February 5, 2002.  He lost good time and was reduced from incentive level four to level one.  His radio and headphones were confiscated. The VSM policy was to reduce inmates who had committed a major violation to level one, no matter what level they had achieved before the violation.

### Denial of the Visit

On January 28, 2002, Plaintiff was denied a visit with his mother, brother and sister, scheduled for January 30, 2002, on the stated grounds that Plaintiff was on Disciplinary Court Review status.[13]  Despite the disciplinary status, Defendant Banks would have had discretion to allow the visit, had he chosen to do so.  Plaintiff denies that he was on review status and thinks the refusal was retaliatory.  The proof did not establish exactly when Plaintiff was placed on disciplinary review status because of the radio incident.  However, the obvious answer to Plaintiff's contention is that the action had not been served on any Defendant and they did not have notice of it at the time the visit was denied.  Plaintiff has failed to prove that denial of the visit was in retaliation for filing the suit.

### Disciplinary Action

The timeline is not as clear as to the imposition of the major disciplinary.  Review and reconsideration took place after service of the suit.

However, there is some evidence that Plaintiff was, indeed, guilty of the offense. This circuit has for years recognized an inmate's claim for retaliatory discipline pursuant

---

[12] Pl.'s ex. 55.

[13] Pl.'s ex. 2.

to § 1983 where a prison official files disciplinary charges in retaliation for the inmate's exercise of his constitutional rights.  See Sprouse, 870 F.2d at 452.  Plaintiff's claim of retaliation will fail, however, if the alleged disciplinary violation was issued for the actual violation of the prison rule.  Henderson v. Baird, 29 F.3d 464, 469 (8th Cir. 1994); see also Cowans v. Warren, 150 F.3d 910, 911 (8th Cir. 1998) (a retaliation claim is precluded if the disciplinary punishment was imposed based on a finding that the inmate actually violated a prison regulation).    Thus, Plaintiff's claim fails if Defendants can successfully demonstrate "some evidence" that Plaintiff actually committed the relevant rule violation(s). Superintendent v. Hill, 472 U.S. 445, 455-56 (1985); Goff v. Burton, 91 F.3d 1188, 1191 (8th Cir. 1996).  This "some evidence" rule allows the federal courts to defer to the judgment of prison officials in maintaining discipline in their institutions while meeting constitutional requirements.  Hill, 472 U.S. at 455-56.  The limited review by federal courts does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Id. at 455.  Even the fact that an inmate may be innocent of the charges does not raise a due process issue; all that is constitutionally required is "due process, not error-free decision-making."  Ricker v. Leapley, 25 F.3d 1406, 1410 (8th Cir. 1994).  Furthermore, a witnessing officer's violation report, standing alone, constitutes "some evidence."  Hill, 472 U.S. at 456; Orebaugh v. Caspari, 910 F.2d 526, 528 (8th Cir. 1990) (per curiam); Rudd v. Sargent, 866 F.2d 260, 262 (8th Cir. 1989) (per curiam).  Prison officials thus can rely on conduct violation reports to find inmates guilty of disciplinary infractions.  Rudd, 866 F.2d at 262.

Officers discovered and confiscated a radio with Plaintiff's ADC number engraved on it in possession of an inmate who was not authorized to have it.  Plaintiff admitted to the

investigative officer that he had loaned it to another inmate.  After a hearing, he was found guilty of the violation.  This disciplinary cannot serve as a basis for a claim of retaliation.

Circumstances following the imposition of the disciplinary warrant discussion. Plaintiff alleges he had a conversation with Defendant Banks in which Banks told him that if he would be forthcoming about the incident, Banks would restore his level.  Plaintiff did write a request for interview to Defendant Banks in which he admitted that his "crime was to lend a radio to a friend."[14]   After reviewing the situation, Defendant Banks declined to modify or re-direct the actions that were taken and the punishment stood.[15]  Plaintiff says that he was mislead and that Defendant Banks induced him to write a falsehood, saying that he could get his level back if he wrote and admitted the violation.  It appears Plaintiff would argue that the later refusal to reverse his level reduction was retaliatory.  Defendant Banks acknowledges he and Plaintiff had a conversation about the reduction, but says all he promised was that he would review the situation and that he would never have made a promise to restore Plaintiff to his previous level without a full evaluation of the situation. He says he told Plaintiff that the regulations as to what should be considered major violations were under review and that he would reassess the violation in that context to see whether Plaintiff's exchange of the radio should be treated as a major violation, resulting in automatic reduction to level one.  He testified he told Plaintiff to put his request in writing and that he would consider it.

---

[14] Pl.'s ex. 67.

[15] Pl.'s ex. 68, 70.

Defendant Banks' version of the events is the more credible and his analysis of whether the violation should be considered a major violation seems sound.  For these reasons, the Court cannot find that the failure to reverse the reduction was retaliatory.  It is unlikely that an official would promise to void the punishment for a mere confession.  After all, Plaintiff had already been found guilty of the infraction.  Plaintiff now wants to say he was not guilty of the exchange, but the fact that he seeks damages for the value of the radio is a direct admission that it belonged to him.  The proof is uncontroverted that the radio was found in possession of an inmate who was not authorized to possess it.  Plaintiff's testimony on this point is simply not credible.   In regard to Defendant Banks' analysis, there is a sound basis for considering the violation to be major.  The basic purpose of the incentive program is to reward adherence to the rules by offering greater privileges when the inmate achieves a higher incentive level.  If inmates in the program are able to obtain privileges illegitimately, without achieving the necessary level, the program is undermined.  Further, allowing inmates to obtain property or favors by exchange of articles, in general, would tend to offer opportunities for abuse.  Plaintiff's exhibits 68 and 70 show that Defendant Banks did carefully consider the question.

The Eighth Circuit has applied a stringent "but for" standard when addressing inmates' claims of retaliation.  <u>Rouse v. Benson</u>, 193 F.3d 936, 940 (8th Cir. 1999); <u>Goff v. Burton</u>, 7 F.3d 734, 737-39 (1993).  Therefore, to prevail on a retaliation claim, an inmate must prove that, but for an unconstitutional, retaliatory motive, prison officials would not have treated him the way they allegedly did.

The Court concludes that Defendant Banks' final decision is the result of a good faith analysis rather than the result of a retaliatory motive.  The decision to treat the

22

infraction as a major violation would have been the same in the absence of any possible retaliatory motive.

## VII.  CONCLUSION

Plaintiff has failed to carry his burden of establishing liability on the part of any Defendant and this case will be dismissed in its entirety, with prejudice.

IT IS SO ORDERED this 13th day of September, 2005.

_____
UNITED STATES MAGISTRATE JUDGE